CONCURRING IN PART AND DISSENTING IN PART
BERNICE B. DONALD, Circuit Judge,
concurring in part, dissenting in part.
The Sixth Amendment guarantees provide an indispensable constitutional safeguard not only of the rights of the accused, but of society’s interest in a just outcome of judicial proceedings. “One touchstone of a fair trial is an impartial trier of facG^-⅛ jury capable and willing to decide the case solely on the evidence before it.’ ” McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). In its unique role, as a group of private citizens called upon to determine guilt or innocence in a criminal trial, “[t]he jury exercises the power of the court and of the government that confers the court’s jurisdiction.” Edmonson v. Leesville Concrete Co., 500 U.S. 614, 624, *782 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); see also Shelley v. Kraemer, 334 U.S. 1, 18, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (state courts and judicial officials reached by Fourteenth Amendment).
Among the most crucial requirements for fairness in judicial proceedings is that racial bias not infect a jury’s deliberations and decisions. This ideal has been historically difficult to attain; as one'of our most compelling literary depictions of the criminal justice system put it, “[t]he one place where a man ought to get a square deal is in a courtroom, be he any color of the rainbow, but people have a way of carrying their resentments right into a jury box.”[1] The Supreme Court has held that racial discrimination, “odious in all aspects, is especially pernicious in the administration of justice,” Rose v. Mitchell, 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), and that to allow it in the jury system harms “both the fact and the perception” of the jury’s role as “a vital check against the wrongful exercise of power by the State,” Powers v. Ohio, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); see also Aldridge v. United States, 283 U.S. 308, 315, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) (public suspicion of bias among jurors harmful to the legitimacy of the courts).
Even a slight suspicion that racial bias corrupted the outcome of a trial may be sufficient to undermine many decades of arduous, patient labor to eliminate the shameful prevalence of such bias in the courts, detracting from “a course of decisions of long standing directed against racial discrimination in the administration of justice.” Cassell v. Texas, 339 U.S. 282, 290, 70 S.Ct. 629, 94 L.Ed. 839 (1950) (Frankfurter, J., concurring).[2] Unfortunately, the majority scants the serious constitutional implications of the problems affecting the jury deliberations in the present case, instead privileging an overly rigid adherence to local rules. I must therefore respectfully dissent 'from Parts II.A and II.B of the majority opinion.
hH
The significance of this case cannot be considered in isolation; it must be viewed in the full, historical sweep of events. Among the Civil War Amendments, “giv[ing] new force and direction” to the “imperative to purge racial prejudice from the administration of justice,” Pena-Rodriguez v. Colorado, — U.S. -, 137 S.Ct. 855, 867, 197 L.Ed.2d 107 (2017), the Fourteenth Amendment had the “central purpose ... to eliminate racial discrimination emanating from official sources in the States,” id. (quoting McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)). Its aim was to “se-cur[e] to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights” enjoyed by the theretofore dominant race. Strauder v. West Virginia, 100 U.S. 303, *783 306, 25 L.Ed. 664 (1880). In 1979, Justice Blackmun wrote:
114 years after the close of the War Between the States and nearly 100 years after Strauder, racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole. Perhaps today that discrimination takes a form more subtle than before. But it is not less real or pernicious.
Rose, 443 U.S. at 558-59, 99 S.Ct. 2993. Another four decades later, that statement still remains, to a troubling degree, true.
A.
The beginnings of the fight to eliminate racial bias in our American justice system can be traced back to the enactment of the Civil Rights Act of 1875, which prohibited the exclusion of persons from jury service based on race. See 18 U.S.C. § 243. The Supreme Court shortly thereafter reiterated the importance of this prohibition. See Strauder, 100 U.S. at 310; Virginia v. Rives, 100 U.S. 313, 322-23, 25 L.Ed. 667 (1880); Ex parte Virginia, 100 U.S. 339, 344, 25 L.Ed. 676 (1880). From these cases emerges a clear theme: “The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors.” Powers, 499 U.S. at 404, 111 S.Ct. 1364 (quoting Batson v. Kentucky, 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)) (citations omitted).
The Supreme Court’s seminal decision in Batson was emblematic of the Court’s “unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn.” Batson, 476 U.S. at 85, 106 S.Ct. 1712 (citation omitted). Before Batson, Supreme Court precedent had made it clear that discrimination based on race was unacceptable in jury composition considerations. The Court had explicitly stated that “[f]or racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.” Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940). The Court reinforced this principle in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled by Batson, 476 U.S. 79, 106 S.Ct. 1712. Although ultimately rejecting the defendant’s claim for lack of proof, the Swain Court reaffirmed the rule that “a State’s purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.” Id. at 203-04, 85 S.Ct. 824 (citations omitted).
Batson further revitalized and solidified this rule. There, the Court held that a defendant may raise an equal protection challenge to the use of peremptory challenges at his own trial by showing that the state used them for the purpose of excluding members of the defendant’s race. Batson, 476 U.S. at 96, 106 S.Ct. 1712. Bat-son’s, thrust is threefold: First, it protects “the right of the defendant ‘to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.’ ” Holland v. Illinois, 493 U.S. 474, 491-92, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (Marshall, J., dissenting) (quoting Batson, 476 U.S. at 85-86, 106 S.Ct. 1712). Second, it protects “the right of a member of the community not to be assumed incompetent for and be excluded from jury service on account of his race.” Id. at 492, 110 S.Ct. 803 (citing Batson, 476 U.S. at 87, 106 S.Ct. 1712). Third, it protects “the need to preserve ‘public confidence in the fairness *784 of our system of justice.’” Id. (quoting Batson, 476 U.S. at 87, 106 S.Ct. 1712).
Since Batson, the Supreme Court has persisted in its quest to minimize the role that race plays in the jury system. In Powers, the Court extended Batson to allow white criminal defendants to raise a Batson challenge to the exclusion of black-jurors. Powers, 499 U.S. at 404, 111 S.Ct. 1364. The Court reached this decision by focusing on the right of potential jurors to avoid exclusion on the basis of race. Id. at 406, 111 S.Ct. 1364. In that same year, the Supreme Court further expanded Batson to apply to civil cases, stating that “[rjacial discrimination has no place in the courtroom, whether the proceeding is civil or criminal.” Edmonson, 500 U.S. at 630, 111 S.Ct. 2077 (citing Thiel v. S. Pac. Co., 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946)). Shortly thereafter, the Court decided Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), where it extended Batson to allow prosecutors to challenge a criminal defendant’s use of peremptory challenges. Id. at 54-55, 112 S.Ct. 2348.[3]
Ultimately, “[t]he Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.” Johnson v. California, 545 U.S. 162, 172, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (citing Batson, 476 U.S. at 97-98, 106 S.Ct. 1712). Pre-Batson jurisprudence highlights a focus on the right that a criminal defendant—and a litigant in general—has to be tried by a jury that has been selected absent from discriminatory criteria. Bat-son reinforced this goal and introduced two other overarching goals. The cases that have followed underscore the need to guarantee equal treatment for potential jurors. These goals—-protection of litigants, of potential jurors, and of public confidence—are threatened by the majority’s decision today. As the Powers Court so eloquently reminded us, the jury’s crucial role in our society is nothing less than to “act[ ]as a vital check against the wrongful exercise of power by the State and its prosecutors.” Powers, 499 U.S. at 411, 111 S.Ct. 1364 (citing Batson, 476 U.S. at 86, 106 S.Ct. 1712). “The intrusion of racial discrimination into the jury selection process,” the Court went on, “damages both the fact and perception of this guarantee.” Id.
B.
As Justice Blackmun noted, discrimination has survived into our times, and is “not less real or pernicious” for “[pjerhaps ... tak[ing] a form more subtle than before.” Mitchell, 443 U.S. at 558-59, 99 S.Ct. 2993. The sense of a shift away from the more explicit prejudice underlying the traditional definition of discrimination has spurred the recent explosion of studies into implicit bias—that phenomenon involving the brain’s use of mental associations so deeply ingrained as to operate without awareness, intention,- or control. In their natural operation, implicit biases allow individuals to efficiently categorize their experiences, and these categories allow people to easily understand and interact with their world. Implicit biases can be positive or negative; it is the negative biases, however, that give rise to problems that we struggle to combat in the law and, more broadly, in our society.
Research has revealed the profusion of implicit attitudes that people hold towards a wide range of characteristics, chief among them the more salient and immutable traits like race and gender. People *785 have a strong tendency to develop implicit associations between particular social groups and certain qualities or characteristics. Researchers “have found that the majority of tested Americans harbor negative implicit attitudes and stereotypes toward blacks, dark-skinned people, [and] other[ ] [groups].”[4] For instance, there is a “consistent[ ] implicit[] association] of “black with negative [qualities] such as bad and unpleasant, [or] with negative stereotypes like aggressive and lazy.”[5] As relates to the typical American juror, these biases can operate to distort a person’s interpretation of the evidence in a case, or the perception of a defendant’s guilt or innocence. For instance, a study found an “apparently] generalizab[le] tendency to interpret actions by a black person as more violent or threatening than the same actions performed by a white person.” [6] Perhaps the most disturbing aspect of implicit bias is that it operates outside of a person’s conscious intent. Such biases often conflict with one’s consciously-held, egalitarian values, and indeed are more predictive of our conduct than are those explicitly-held values. This subconscious, involuntary quality of implicit -bias makes its potential impact all the more difficult to identify, combat, and rectify.
Implicit biases threaten the very foundation of our criminal justice system. Our system is one that is built on fairness. The right to a fair trial. The right to a trial by jury of one’s peers. The right to be assumed innocent until proven guilty. The prevalence of these biases that are so pervasive and involuntary erodes the rights that our Constitution aims to protect, and undermines the advances that our society has made towards eliminating the role that race plays in our criminal justice system. The majority’s decision overlooks the far-reaching impact of these biases and, more importantly, the devastating impact that they very likely played in Defendants’ trial.
II.
With this highly charged history and these important principles firmly in mind, I turn to the issues presented in the case at hand. Defendants raised the violation of their right to a fair and impartial jury by way of appealing the district court’s refusal to grant their motion for a new trial or, in the alternative, an evidentiary hearing.[7] *786 I agree that our review of a district court’s denial of a motion for a new trial is for abuse of discretion. United States v. O’Dell, 805 F.2d 637, 640 (6th Cir. 1986); see also United States v. Shackelford, 777 F.2d 1141, 1145 (6th Cir. 1985) (relating to a district court’s denial of an evidentiary hearing for claims of jury misconduct). The highly deferential nature of this standard, however, does not discharge our responsibility to rectify constitutional errors.
A.
I begin with the district court’s chief reason for denying Defendants’ motion for a new trial: that the juror statements were improperly obtained and “amount[ed] to no more than “weakly authenticated juror statements containing vague allegations of ‘harassment’ and ‘verbal abuse.’ ” United States v. Floyd, No. 2:14-CR-126, 2015 WL 5680390 at *4, 2015 U.S. Dist. LEXIS 129263 at *12 (S.D. Ohio Sep. 25, 2015) (citation omitted). As relates to the evidence having been improperly obtained, the district court relied on Southern District of Ohio Local Civil Rule 47.1, made applicable to criminal cases by Local Criminal Rule 1.2, and which provides that “[n]o attorney, party or anyone acting as agent or in concert with them connected with the trial of an action shall ... contact, interview, examine, or question any juror regarding the verdict or deliberation of the jury in the action except with leave of the Court.” Also pertinent here is Rule 606(b) of the Federal Rules of Evidence, which provides that:
During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury’s deliberations; the effect of anything on that juror’s or another juror’s vote; or any juror’s mental processes concerning the verdict or indictment. The court may not receive a juror’s affidavit or evidence of a juror’s statement on these matters.
Fed. R. Evid. 606(b)(1).
The undeniable importance of this evidentiary rule does not mean that it is paramount where basic constitutional rights are at issue. This year, the Supreme Court decided Pena-Rodriguez, 137 S.Ct. 855, a case where a juror’s statement indicated that racial animus was a significant factor in the juror’s decision regarding guilt or innocence. The Court held:
[W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the [Rule 606(b)] no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror’s statement and any resulting denial of the jury trial guarantee.
Id. at 869. The Court clarified that “[n]ot every offhand comment indicating racial bias or hostility” will suffice; rather, “there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury’s deliberations and resulting verdict.” Id. With regard to racial bias in the jury deliberations here, the majority finds it dispositive that, unlike the situation in Pena-Rodriguez, the foreperson “did not make comments showing that animus was [a] ‘significant motivating factor’ in her own vote to convict.” It is true that the Pena-Rodriguez Court set, as a requirement for a statement indicating jury bias to trigger judicial inquiry, that “the statement ... tend to show that racial animus was a significant motivating factor in the juror’s vote to convict.” Id. at 859. But this does not gainsay that the Pena- *787 Rodriguez Court also casts a wider constitutional net, pointing to the appropriateness of a broader inquiry, not into “every offhand comment indicating racial bias or hostility,” certainly, but as to whether a statement “cast serious doubt on the fairness and impartiality” of the jury’s decision. Id. at 869.
That the facts in Pena-Rodriguez do not mirror precisely the facts in the present case is readily noted. In Pena-Rodriguez, following a three-day trial, the court gave counsel permission to speak with the jurors. Two jurors voluntarily spoke to counsel and stated that during deliberations another juror had expressed anti-Hispanic bias towards the defendant and defendant’s alibi witness. According to the jurors, the biased juror had made such comments as he “believed the defendant was guilty because in [the juror’s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women.” Id. at 862. The juror also stated, “I think he did it because he’s Mexican and Mexican men take whatever they want.” Id. The Supreme Court concluded that “[w]hen jurors disclose an instance of racial bias as serious as the one involved in this case, the law must not wholly disregard its occurrence.” Id. at 870.
The jury foreperson’s racial animus in the present case, in contrast, was not aimed directly at the Defendants but, rather, was directed at the two black jurors. I do not believe, however, that this difference is sufficient to overcome the taint of racial prejudice on the proceedings. In Pena-Rodriguez, the Supreme Court rested its decision on the idea that “[t]he jury is to be ‘a criminal defendant’s fundamental protection of life and liberty against race or color prejudice.’ ” Id. at 868 (quoting McCleskey v. Kemp, 481 U.S. 279, 310, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). As such, “[a] constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right.” Id. at 869. This commitment to eliminating racial bias in the jury deliberation process, expressed so forcefully by the Pena-Rodriguez Court, applies equally to the present case, where the jury foreperson injected her racial biases explicitly into the deliberative process. It is hardly a strained inference that, where a juror displays racial bias towards another juror of the same race as the defendant, that juror is incapable of impartially judging the guilt of the defendant. This inference is a natural, and even necessary, extension of the Supreme Court’s reasoning in Pena-Rodriguez.
The present case differs from Pena-Rodriguez, too, in that counsel here acted in violation both of the district court’s express order not to contact jurors and of the district court’s local rules. This conduct played a major role in the district court’s denial of Defendants’ motion for a new trial or evidentiary hearing. In Pena-Rodriguez, the Supreme Court concluded that the rules of professional ethics and local court rules will guide the practical mechanics of acquiring and preserving evidence, id., and especially noted that defendant’s counsel did not seek out the two jurors’ allegations of racial bias, id. at 870. Certainly, I cannot condone counsel’s violation of the district court’s local rules, much less the disobedience of express orders of the court. Such rules and orders are vital safeguards put in place to protect the privacy of jurors. Nevertheless, as important as they are, such considerations must bend in the face of possible constitutional violations. The Supreme Court has cautioned, *788 with regard to evidentiary rules, against “applying] [rules] mechanistically to defeat the ends of justice,” instead urging pursuit of “the fundamental standards of due process.” Rock v. Arkansas, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (quoting Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)); see also Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (important public policy underlying evidentiary rules does not trump the mandates of the Constitution). Moreover, other avenues—such as sanctions against counsel—are available to punish such blatant disregard for court rules. The answer, however, cannot be to disregard Defendants’ fundamental constitutional right. Again, the real possibility that such improper bias infected the jury’s verdict is sufficient to prevail over counsel’s improper conduct.
The district court also based its denial of the motion for a new trial on the fact that after the three days of deliberation, each juror was polled individually and responded that the verdict was unanimous, un-coerced, and a fair reflection of his or her vote. Floyd, 2015 WL 5680390 at *3, 2015 U.S. Dist. LEXIS 129263 at *9. The court then dismissed Defendants’ challenges as post-conviction recantations. Id. at *3-4, 2015 U.S. Dist. LEXIS 129263 at *10. Given the Supreme Court’s very clear admonition that racial bias, when left unaddressed, poses a risk of systemic injury to the administration of justice, see Pena-Rodriguez, 137 S.Ct. at 868, I believe that the district court’s willingness to dismiss evidence of the racial hostility permeating the jury deliberation process in this case led the court into error. And the facts bear witness to this.
The white jury foreperson accused the two black members of the jury of deliberately trying to hang the jury because of their shared race with the Defendants, raising the suggestion that the two jurors were protecting Defendants because “maybe [they] felt [they] owed something to [their] black brothers.” The foreperson also stated, “I find it strange that the colored women are the only two that can’t see” the defendants’ guilt. These comments escalated the tension in the jury room to the point that the marshal’s intervention was required. The severity of this situation diminishes the weight properly given to the two black jurors’ confirmation that their votes were uncoerced. In essence, the white jury foreperson’s comments embody the decades-old concern given voice by Justice Marshall in Batson: “Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State’s case against a black defendant than it can be justified by the notion that blacks lack the ‘intelligence, experience, or moral integrity’ to be entrusted with that role.” Batson, 476 U.S. at 104-05, 106 S.Ct. 1712 (1986) (Marshall, J., concurring) (quoting Neal v. Delaware, 103 U.S. 370, 397, 26 L.Ed. 567 (1881)) (citation omitted). Such an implication is prejudicial to the defendant, demoralizing to the juror, and completely antithetical to the truth: “A person’s race simply ‘is unrelated to his fitness as a juror.’ ” Id. at 87, 106 S.Ct. 1712 (quoting Thiel, 328 U.S. at 227, 66 S.Ct. 984 (1946) (Frankfurter, J., dissenting)).
The jury foreperson’s remarks are characterized by the majority as “racially insensitive.” However, what is at issue is not the interpersonal quality of sensitivity (or its absence), but rather the constitutional implications associated with the injection of racial animus and racial considerations into jury deliberations. Aside from the racial prejudice that the jury foreperson’s comments suggest she harbored, also trou *789 bling is the possibility that the black jurors may plausibly have felt pressure to swing around to the majority’s view and vote to convict in order to demonstrate that they were not approaching their obligations as jurors out of racial considerations.
In other words, the foreperson’s comments arguably exerted pressure on the two unpersuaded jurors to change their minds, and votes, in order to disprove the “belief’ alluded to by Justice.Marshall in Batson, “that blacks are less likely than whites to consider fairly ... the State’s case against a black defendant....” Id. at 104, 106 S.Ct. 1712: “A juror who allows racial ... bias to influence assessment of the case breaches the compact [underlying the jury system] and renounces his or her oath.” J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 153, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring). This caution arguably applies as much to a juror who makes racial considerations an argument in deliberations with fellow jurors, as it does to a juror who votes to convict out of racial animus.
Ultimately, I believe that the evidence of racial animus and harassment presented by Defendants, notwithstanding the undeniable formal improprieties connected with its production, created reasonable grounds to doubt the validity of the jury verdict. I would remand this case to the district court for, at a minimum, an evidentiary hearing on Defendants’ claims.
B.
I differ with the majority as well with respect to the Allen charges. The majority concludes that the charges were not improper. The Allen charge is one that delicately balances the obligation of each juror both to consider carefully the arguments of the other jurors about the proper verdict, and to vote his or her conscience rather than simply acquiesce to the opinions of others. United States v. Scott, 547 F.2d 334, 336 (6th Cir. 1977) (citing Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). Our Court has allowed the use of such charges, but cautions that “[a]ny variation upon the precise language approved in Allen imperils the validity of the trial.” Id. at 337. Because “a defendant has a right to rely on the fact that an ultimate jury disagreement is a permissible result of a trial[, t]he reminder that no juror should merely acquiesce in the majority opinion is therefore one of the most important parts of the [Allen ] charge.” Id.
Defendants’ argument is that the district court’s first instruction[8] was, in essence, a modified Allen charge, which was then exacerbated by the two subsequent Allen charges. This argument is persuasive. In its first instruction to the jury, the district court ended by saying: “I would encourage you to resolve the conspiracy issue because ultimately all these issues have to be resolved.” This language, similar to language that this Court has rejected in the past, see United States v. Harris, 391 F.2d 348, 355 (6th Cir. 1968) (criticizing the district court’s statement that “this lawsuit must be decided—it must be decided at some time by some jury”), tends to mislead a jury by failing to inform the jury of its right not to reach a unanimous verdict. *790 “For the judge to tell a jury that a case must be decided is ... not only coercive in nature but is misleading in fact. It precludes the right of a defendant to rely on the possibility of disagreement by the jury.” Id.
Contrary to the Government’s argument, this coercive instruction in the present case was not “cured” by the subsequent Allen charges. Rather, the instruction, followed by two Allen charges given in such close proximity to each other, and accompanied by the district court’s additions of “listen to one another both carefully and respectfully” and “as mature adults, every one of you has had a disagreement with someone and has been able to work through it at some point in your lives,” very likely compounded the coercion. The latter instruction, particularly, by asserting a likeness between a juror’s solemn responsibilities and the ordinary process of resolving discord and reaching agreement.in everyday life, arguably mischaracterized the legal and constitutional import of a jury’s deliberations. The district court’s repeated pressing of the jury to continue deliberations exceeded “the limit[ ] beyond which a trial court should not venture in urging a jury to reach a verdict.” Scott, 547 F.2d at 336-37.
It is doubtless a task of some difficulty for a court, on appellate review, to weigh the prejudicial impact of a variation of the approved Allen charge. See id. at 337 (citing United States v. Flannery, 451 F.2d 880, 883 (1st Cir. 1971))..Nonetheless, the evidence in this case makes it clear that the cumulative effect of the district court’s instructions and Allen charges was coercive and likely forced the jury to believe that it was obligated to return a unanimous verdict. In my view, the district court’s error is plain, and I would reverse and remand on this issue.
III.
The history of racial bias in the courtroom is not only a stain on our shared past; its corrosive effects persist to this day. The enduring shadow of bias also dims public confidence in the fairness of the courts. The majority’s decision represents a step backwards from the strides we have made towards eradicating this disgraceful legacy from our criminal justice system. For the reasons set forth above, I differ with the majority with regard to the issues of racial animus within the jury and to the Allen charges, which, operating in a mutually reinforcing manner, exerted pressure on the two black jurors who were not prepared to vote for a guilty verdict. In combination with the racial animus contained in the jury foreperson’s remarks, these circumstances raise serious doubts about the fairness and impartiality of the jury’s decision. With regard to the remaining issues in this case, I concur with the majority.

. Harper Lee, To Kill a Mockingbird 224 (1988). The words are spoken by the character of the attorney, Atticus Finch.

. The words ''bias” and "discrimination,” while clearly distinguishable as referring to beliefs and practices, respectively, are also closely intertwined. One group of scholars has referred to the two terms as being linked in a "rhetorical relationship ... [that] is bidirectional. Identifying a discriminatory behavior inclines one to view its psychological correlate as a form of bias, and conversely, identifying a psychological state as biased bolsters the condemnation of a discriminatory behavior.” R. Richard Banks, Jennifer L. Eberhardt & Lee Ross, Discrimination and Implicit Bias in a Racially Unequal Society, 94 Calif. L. Rev. 1169, 1188 n.104 (2006). In assessing the conceptual relationship, the authors caution against mechanistic assumptions of a causal link between biased belief and discriminatory behavior. Id. at 1187 n.97.

. The Court also extended Batson to the use of peremptory challenges based upon gender. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

. Robert J. Smith & Justin D. Levinson, The Impact of Implicit Racial Bias on the Exercise of Prosecutorial Discretion, 35 Seattle U.L. Rev. 795, 802 (2012).

. Id.

. H. Andrew Sagar & Janet W. Schofield, Racial and Behavioral Cues in Black and White Children's Perceptions of Ambiguously Aggressive Acts, 39 J. Personality & Soc. Psychol. 590, 597 (1980). The authors cautioned that the correlation had been noted, to that point, "only in the case of males observing interactions between males” and welcomed further study on different gender combinations of observers and actors. Id. The authors found that black subjects also showed a tendency to interpret black behaviors as aggressive, though the tendency was not- as pronounced as among white subjects. The study, which tested black and white 6th-grade students, was an attempt to determine the validity of earlier research showing that the act of shoving another person during a dispute was interpreted as violent by 73% of subjects when the person doing the shoving was black, and by 13% of subjects when the person doing the shoving was white. Id. at 590 (citing B.L. Duncan, Differential Social Perception and Attribution of Intergroup Violence: Testing the Lower Limits of Stereotyping of Blacks, 34 J. of Personality & Soc. Psychol. 590 (1976)).

.Technically, Defendant Floyd filed the motion for a new trial and the other two Defendants moved to join in the motion. The district court denied the motion for a new trial and denied the motions as moot. Because the district court based both denials on the same *786 reasons, it is clearer to treat all three as a denial of a motion for a new trial.

. The jury’s first note to the district court asked, “If we cannot agree on Count One of conspiracy, can we rule on other counts?” In response, the district court instructed the jury as follows:
Yes, you may. It is easier in some respects, because there is a certain logic in taking up the issues in the order in.which I read them to you in my instructions, but I will not tell you the order in which you have to take up consideration of the issues. I would encourage you to resolve the conspiracy issue because ultimately all the issues have to be resolved.